# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:17-cv-00397-RJC-DCK

LISA KERI STRICKLIN,        )
                                 )
        Plaintiff,        )
                                 )
    v.                    )           ORDER
                                 )
GWEN STEFANI and LIVE NATION  )
ENTERTAINMENT, INC.,       )
                               )
        Defendants.     )
_____)

      **THIS MATTER** comes before the Court on the following: (1) Defendant Gwen Stefani's Motion for Summary Judgment and Memorandum in Support, (Doc. No. 40); (2) Defendant Live Nation's Motion for Summary Judgment and Memorandum in Support, (Doc. Nos. 38, 39); (3) Plaintiff's Responsive Briefing in Opposition, (Doc. Nos. 59, 60); (4) Defendants' Replies (Doc. Nos. 65, 68); and the Supplemental Briefing and supporting exhibits, (Doc. Nos. 75–77), allowed pursuant to the Court's Order dated December 4, 2018, (Doc. No. 74). Also before the Court is Defendant Live Nation's Motion for Judgment on the Pleadings and Memorandum in Support, (Doc. Nos. 25, 26); Plaintiff's Responsive Briefing in Opposition, (Doc. No. 30); and Defendant Live Nation's Reply, (Doc. No. 31).

## I.   BACKGROUND

*I know I've been a real bad girl*
*(I'll try to change)*
*I didn't mean for you to get hurt whatsoever[1]*

This case is about whether a performer ("Gwen Stefani" or "Defendant Stefani") and the company who booked the performer and oversaw the performance ("Live Nation" or "Defendant Live Nation") should be held liable for a concert patron's ("Plaintiff") personal injuries after the performer invited patrons to move toward the stage, prompting an alleged "stampede crowd rush."  (Doc. No. 13 ¶ 24(a)).  The record establishes, the parties agree, and/or the parties do not dispute the following.

### A.  Stefani's Invitation and Plaintiff's Injury

On July 23, 2016, Plaintiff attended a Gwen Stefani concert at PNC Music Pavilion in Charlotte, North Carolina, a venue owned and operated by Live Nation Worldwide, Inc. ("Live Nation").[2]  (Doc. No. 13 ¶¶ 7, 10).  Live Nation booked singer Gwen Stefani to perform at PNC Pavilion.  (Id. ¶ 10).  PNC Pavilion has two main seating options for attending patrons.  (Id. ¶ 8).  There are approximately 8,614 reserved theatre-style seats ("reserved area") closer to the performance stage and approximately 10,154 available spaces in the lawn seating area farther from the

---

[1] Gwen Stefani & Akon, The Sweet Escape (Interscope Records 2006).

[2] In the instant lawsuit, Plaintiff sued Live Nation Entertainment, Inc., but Defendant asserts that Plaintiff has not sued the correct Live Nation entity.  (Doc. No. 39 at 1).  Rather, Defendant Live Nation contends that Live Nation Worldwide, Inc. owns and operates the subject premises and employs those who work there. (Id.).  Live Nation asserts that "[r]egardless of which Live Nation entity is named, Live Nation is entitled to summary judgment on Plaintiff's claim."  (Id.).

stage ("lawn").  (Id.).  Plaintiff purchased a ticket in the reserved seating area,

specifically in section 7, row v, seat 20 and attended the concert with a group of her

friends.  (Id. ¶¶ 11–12).  Defendant Stefani entered an annotated diagram of the

venue into evidence, which the Court incorporates below:



(Doc. No. 40-3: Diagram of PNC Pavilion).

Twenty minutes into Stefani's performance, Stefani invited patrons to move

closer to the performance stage:

> I'm just going to tell you something. I'm just going to talk to the
> security guards for one second. If anyone wants to come down a little
> closer so I can see you a little better, just come on down, I don't think
> anyone's going to care, like just fill it in and like and you know, who
> cares about your lawn chairs, you can get new ones."

(Doc. No. 40-4 at 2).

Following this announcement, a crowd of lawn patrons moved through the

reserved area and climbed over chairs and railings to get closer to the performance

stage.  (Id.).  Plaintiff claims that, at this juncture, she was terrified as she saw the crowd moving forward behind her.  (Doc. No. 59 at 2).  She alleges that, in an attempt to escape the danger, she left her seat, moved left toward the aisle, and tried to move in the opposite direction of the stage to try and "get out."  (Id.). Plaintiff asserts she could not get out because "she was being pushed by the crowd rushing toward the stage, and feeling "hydroplaned," was then trampled and forcibly pushed into a wall.  (Id.).  She ended up injured on the ground "at the top of section 2 close to the VIP barricades."  (Doc. No. 39 at 4).  Plaintiff's injury occurred approximately five minutes after Stefani's initial announcement.  (Id.).  Paramedics transported Plaintiff to the hospital where she was diagnosed with a lateral tibial plateau fracture to her left leg.  (Doc. No. 13 ¶ 18).  Plaintiff underwent surgery approximately two weeks later.  (Doc. No. 40-1 at 3).

### B. Live Nation's Response and Stefani's Retraction

Live Nation employed security personnel to staff Stefani's performance and supplied security barriers at certain locations to manage crowd control.  (Doc. No. 13 ¶ 14).  Live Nation has placed various physical barricades in the venue to block off the lawn section from the reserved section.  (Doc. No. 39 at 5).  These barricades include a concrete wall extending around the perimeter of the upper reserved area, railings separating the lawn area from the upper reserved area, and bicycle racks positioned throughout the venue at the tops of the sections where guest services employees are stationed.  (Doc. No. 39-11 at 15–16, 24–25).

Live Nation staffed the Stefani concert with over thirty ushers assigned to

various seating sections at the Pavilion, fifty-two total civilian security personnel, and twenty-seven off-duty police officers deployed in and around the venue. (Doc. No. 39 at 5). Nevertheless, Plaintiff and Plaintiff's friends claim that they saw very few Live Nation security personnel during the alleged stampede and heard no safety instructions from security personnel. Plaintiff asserts she saw only one possible security individual during the crowd rush when patrons were jumping over seats and moving forward. (Doc. No. 59 at 2).

Live Nation held a security briefing for security personnel prior to the concert. (Doc. No. 39 at 5). At this briefing, security personnel did not specifically discuss what to do in an event of a crowd rush to protect patrons. (Doc. No. 60 at 6). Charles Singley, a guest services supervisor for Live Nation, testified that Live Nation has a general protocol for when a few patrons (i.e., one to five) attempt to move out of their designated ticket area and toward the stage: "we try and hold the line . . . fast where [they] have the controlled entrances into the sections" and prevent the few patrons from moving forward (Doc. No. 59-7 at 6–7; Doc. No. 39-11 at 25). But Singley noted that a different procedure applies when there are many people rushing the stage:

> However, if it's a massive group of people or more than what would be expected for them to handle, my first concern is their safety, and I typically will instruct them to open that bicycle rack up completely. That way the guests aren't having to climb over the rails so they themselves won't get injured and for them to step up behind the concrete wall.

(Doc. No. 39-11 at 26; see also Doc. No. 59-7 at 7). In the instant case, at least one security agent followed this procedure in response to the numerous lawn patrons

rushing toward the stage after Stefani's invitation.  (See Doc. No. 59 at 4).  In fact, one of Plaintiff's friends testified that she saw "one security agent remove a barrier to allow the rush to flow into the reserved sitting area."  (Id.).

According to Defendant Live Nation, when Stefani initially invited patrons to move toward the stage, Live Nation's Operations Manager Mac Goodrum, who was located in the lawn seating area, "rushed" to the reserved seating area and notified the Live Nation General Manager Peter O'Donnell, via two-way radio, of Stefani's announcement.  (Doc. No. 39 at 6).  When Goodrum arrived in the reserved seating area he instructed ushers "to not let anybody through."  (Id.).  Goodrum also claims that he tried to stop the patrons who were trying to climb rails and attempted to redirect the ones who had already climbed over.  (Id.).

After receiving the radio call from Goodrum, O'Donnell, who was backstage at the time and near Stefani's tour manager Brian Cross, informed Cross of the issue and instructed Cross to tell Stefani to retract her invitation and tell patrons to return to their ticketed areas.  (Id.; Doc. No. 60 at 8).  In turn, Stefani's tour manager communicated with Stefani, who at that point, rescinded the invitation to the crowd about ten minutes after her initial invitation:

> Hold on a second. So I went back there, I went back to change for you guys, I got in so much trouble for telling you guys to come up here, so, I liked it though, it was fun, like I never get in trouble anymore so it was good, but you guys kind of have to move out of the fire lane or else I'm dead, so, FYI, they said they would beat me afterward and all this stuff so, anyways, I don't want anyone to get hurt, and I'm in trouble, can you please get back to your seats?

(Doc. No. 40-5 at 2).  Contemporaneous with Goodrum and O'Donnell's efforts,

Singley positioned himself at the top of sections 2 and 3 with another guest services employee to prevent the crowd shift from moving forward. (Id.). Singley observed patrons climbing over railings and prepositioned bicycle racks at the tops of the sections; however, Singley notes that the majority of patrons gave up, turned around, and walked away. (Id. at 7).

### C. The Instant Suit

On July 7, 2017, Plaintiff filed suit against Defendants. (Doc. No. 1). In her Amended Complaint, Plaintiff asserts individual claims of negligence against (1) Stefani; and (2) Live Nation, under the doctrine of respondeat superior, for the negligence of Live Nation's employed security personnel; and seeks compensatory damages for the alleged negligence. (Doc. 13, ¶¶ 23-31). Plaintiff also seeks punitive damages against Stefani. (Id. ¶¶ 32–33). In September 2017, Defendants filed answers, (Doc. Nos. 15–16). On January 25, 2018, Defendant Live Nation moved for judgment on the pleadings, (Doc. No. 25). Plaintiff timely filed an opposition brief, and Defendant Live Nation timely filed a reply brief. On August 30, 2018, Defendants Stefani and Live Nation filed separate motions for summary judgment against Plaintiff. (Doc. Nos. 38, 40). Plaintiff timely filed opposition briefing to both Defendants' motions, (Doc. Nos. 59, 60), and Defendants timely filed reply briefs (Doc. Nos. 65, 68). On November 28, 2018, the Court held oral arguments on the pending motions. Having been fully briefed and argued, these motions are now ripe for adjudication.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment, rather it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Id. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson, 477 U.S. at 248–49. "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate. Id. at 249–50 (citations omitted).

## III.   DISCUSSION

### A. Defendant Stefani's Motion for Summary Judgment

#### 1. Plaintiff's Negligence Claim Against Stefani

To find Stefani negligent, Plaintiff must show that Stefani owed Plaintiff a duty of reasonable care, (2) Stefani breached that duty, (3) Stefani's breach was an actual and proximate cause of Plaintiff's injury, and (4) Plaintiff suffered damages as the result of Stefani's breach. Gibson v. Ussery, 196 S.E.2d 666, 668 (N.C. Ct. App. 2009). Generally, whether a plaintiff has established the requisite elements of negligence is a matter for the jury. Id. Summary judgment, therefore, is appropriate only if there are no genuine issues of material fact, and there is no evidence supporting one of the elements of negligence. Shook v. Lynch & Howard, P.A., 563 S.E.2d 196, 197 (N.C. Ct. App. 2002).

Plaintiff asserts that Stefani was negligent in performing acts that a person of ordinary prudence in the same or similar circumstances would not have done and breached a duty of care owed to Plaintiff by "encouraging, directing, and requesting" patrons to move toward the stage, "causing a foreseeable stampede crowd rush." (Doc. No. 13 ¶ 24). Plaintiff claims that, as a direct and proximate result of Stefani's negligence, Plaintiff sustained serious bodily injuries as well as emotional damages in terms of pain and suffering and mental anguish. (Id. ¶ 25). Plaintiff seeks compensation for the damages she has incurred (e.g., medical bills, lost earnings, pain and suffering) as well as for future damages since she has been informed that injury to her leg is permanent. (Id. ¶¶ 25–26). The Court finds that Plaintiff has put forth sufficient evidence from which a reasonable jury could return a verdict for Plaintiff on her negligence claim against Stefani.

### a. The First Amendment cannot immunize Stefani from liability for negligence.

In her Motion for Summary Judgment, Stefani does not focus on why she was not negligent at the concert. Rather, Stefani attempts to circumvent the issue of her alleged negligence altogether by contending that her concert statements are protected speech under the First Amendment of the U.S. Constitution and thus necessitate summary judgment on Plaintiff's negligence claim. Stefani asserts that because her statements do not fall into one of the exceptions to the First Amendment, she cannot be held liable in tort. The Court agrees that Stefani's statements do not fall squarely within one of the previously recognized categorical exemptions to First Amendment protection. However, the

Court disagrees that the First Amendment immunizes all other speech falling outside these categories, including negligent speech which results in bodily injury to others.

It is the Court's duty to determine, as a question of law, whether a statement should be afforded First Amendment protection if the facts are not in dispute. See, e.g., Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971). The First Amendment provides the following: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. Amend. I. While this case has nothing to do with congressional abridging of speech, case law has established "that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment." Snyder v. Phelps, 580 F.3d 206, 217 (4th Cir. 2009) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 264–65 (1964)), aff'd, 562 U.S. 443 (2011). "Regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for reputational, mental, or emotional injury allegedly resulting from the defendant's speech." Id. at 218. Yet how does the First Amendment apply when a plaintiff seeks damages for bodily harm allegedly resulting from the defendant's speech? That is the question with which the Court is tasked today.

Here, the parties ask the Court to draw the line between "speech unconditionally guaranteed and speech which may legitimately be regulated,

suppressed, or punished." Speiser v. Randall, 357 U.S. 513, 525 (1958). When the question is one of alleged trespass along that "fine line," "the rule is that [the Court] must 'examine for [itself] the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." New York Times Co., 376 U.S. at 285 (quoting Pennekamp v. Florida, 328 U.S. 331, 335 (1946)). "Where, as here, the First Amendment is implicated by the assertion of tort claims arising from speech, we have the obligation 'to make an independent examination of the whole record in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Snyder, 580 F.3d at 218 (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984)).

As the parties note, the Supreme Court has previously recognized certain categories of speech which fall outside of First Amendment protection: (1) fighting words; (2) incitement to riot; (3) libelous speech; (4) obscenity; and (5) child pornography. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 504 (1984). The parties agree that Stefani's statements do not fall within one of these categories. Stefani contends that because her statements fall outside of these categories, the Court's inquiry should stop, asserting that the First Amendment protects all other speech constituting artistic expression.[3] Stefani is wrong. As

---

[3] Plaintiff contends that Stefani's speech should be considered commercial speech, which is entitled to less First Amendment protection than "other constitutionally safeguarded forms of expression." See Bolger v. Youngs Drug Products Corp., 463

mentioned, the relevant task before the Court is to examine the statements and surrounding circumstances and weigh how those statements either further or hinder the principles and purposes undergirding the First Amendment. In all First Amendment cases, this is the central inquiry. Indeed, the Supreme Court derived these now well-known categorical exceptions by utilizing and applying this balancing test:

> There are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

Bose Corp., 466 U.S. at 504 (citing Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)). Thus, while the Supreme Court has clearly defined five categories of speech which do not further First Amendment principles, these categories are not all-encompassing of unprotected speech. The Supreme Court has not held that all other speech is automatically entitled to broad First Amendment protection. Statements exist outside of these categories which do not further the exposition of ideas, search for truth, and the vitality of a society, but on the contrary, actually disserve society by creating the potential for disorder and danger. Stefani's statements are of such tenor.

---

U.S. 60, 64–65 (1983). Because the Court finds that Stefani's speech is not protected by the First Amendment even if it is classified as artistic expression, the Court need not reach Plaintiff's commercial speech argument.

i.  Stefani's Statement

First, the Court must examine Stefani's statement which prompted the current lawsuit:

> I'm just going to tell you something. I'm just going to talk to the security guards for one second. If anyone wants to come down a little closer so I can see you a little better, just come on down, I don't think anyone's going to care, like just fill it in and like and you know, who cares about your lawn chairs, you can get new ones."

(Doc. No. 40-4 at 2).  On its face, Stefani's statement was intended to prompt action; it was not intended to further the marketplace of ideas or to aid in "the common quest for truth and the vitality of society as a whole."  <u>Bose</u>, 466 U.S. at 503–04. Stefani claims that her comments "were made solely to enhance the feel and experience of her music at her concert."  (Doc. No. 68 at 3).  This might be true, but imbuing Stefani's invitation with artistic significance does not immunize her from being held accountable for negligence and the resulting harm which flowed from her statements.

ii. Circumstances in Which Stefani's Statement was Made

Next, the Court must assess the circumstances in which Stefani made her statement.  Stefani heavily relies on the case of <u>McCollum v. CBS</u>, 249 Cal. Rptr. 187 (Cal. Ct. App. 1988), to argue that her statement is protected under the First Amendment.  In addition to this case being nonbinding, it is distinguishable due to the differing circumstances in which the statement was made.  In <u>McCollum</u>, plaintiffs sued singer John "Ozzy" Osbourne for civil damages for composing, performing, producing, and distributing certain recorded music

containing lyrics which plaintiffs claimed resulted in the suicide of their son.
McCollum, 249 Cal. Rptr. at 189. Plaintiffs argued that Osbourne's music and lyrics were of such a character as to incite the decedent to commit suicide and intentionally aided, advised, and/or encouraged the decedent to do so. Id. at 191. The California Court of Appeals rejected the plaintiffs' arguments and held that the First Amendment protected Osbourne's musical lyrics. 249 Cal. Rptr. at 193–94. Stefani analogizes the present case to McCollum and asserts that First Amendment protection should apply to her statement made at a musical performance too. But, Stefani ignores the circumstances and reasoning behind McCollum.

In reaching its decision, the California Court of Appeals noted that it must conclude "in order to find a culpable incitement, (1) that Osbourne's music was directed and intended toward the goal of bringing about the imminent suicide of listeners and (2) that it was likely to produce such a result." Id. at 193. The court emphasized the lack of intent or likelihood on Osbourne's part: "None of the lyrics relied upon by plaintiffs, even accepting their literal interpretation of the words, purport to order or command anyone to any concrete action at any specific time, much less immediately." Id. at 193. The court explained that "[n]o rational person would or could believe otherwise nor would they mistake musical lyrics and poetry for literal commands or directives to immediate action." Id. at 194 (footnote omitted). The court noted that

> [t]his is particularly true when the artist's performance of such musical lyrics and poetry was physically and temporarily remote from the listener who only subsequently hears such performance by means of an electronic recording. The circumstances and conditions under

which the listener might receive such performance are infinitely variable and totally beyond both the control and the anticipation of the performing artists and the producers and distributors of the recording.

Id. at 194, n.10 (emphasis added).

The circumstances in which Stefani communicated her statement are different than the circumstances in which Osbourne communicated his message. First, McCollum involved substantive lyrics—not concert directions—which could be seen as triggering fundamental principles of First Amendment protection. Second, unlike the McCollum plaintiff who was physically and temporarily distant from the artist and musical performance at issue, Plaintiff was in the same time and place as Stefani when Stefani invited the audience to come forward. Stefani made her statement during a live musical performance—she knew the exact circumstances and conditions under which the concert attendees would receive her message. Stefani issued an in-person invitation to thousands of people in a stadium-like arena to come forward toward the stage. And Stefani's announcement, unlike the lyrics in McCollum, was intended to produce immediate action and was likely to bring that action about. Therefore, a jury could find that Stefani could have anticipated the reaction that her statement would prompt: thousands of people, many of whom were consuming alcohol, to descend toward the stage immediately. And it is foreseeable that in this mass movement, someone could get hurt. Overall, Stefani's in-person invitation weighs more toward a statement prompting immediate and likely action than one promoting artistic expression and the free exchange of ideas (i.e., one meriting First Amendment protection).

Plaintiff's case is more analogous to <u>Weirum v. RKO General, Inc.</u>, 539 P.2d 36 (Cal. 1975). There, the plaintiff brought suit against a radio station that planned and held a promotional contest during summer vacation aimed at a teenage audience. <u>Id.</u> at 38. The contest required teenage listeners to follow the disc jockey's car throughout Los Angeles to claim a prize. <u>Id.</u> The station broadcasted periodic updates, in real time, of the disc jockey's current whereabouts, instructing listeners to "be on the lookout" and encouraging them to be the first to arrive in order to receive the cash prizes. <u>Id.</u> During the pursuit, a teenage listener forced a car off the highway, killing the sole occupant. <u>Id.</u> The court allowed the plaintiff's negligence claim to go forward, finding that "[i]t was foreseeable that the defendant's youthful listeners, finding the prize had eluded them at one location, would race to arrive first at the next site and in their haste would disregard the demands of highway safety." <u>Id.</u> at 40. Although the defendant contended that the giveaway contest "must be afforded the deference due society's interest in the First Amendment," the court dismissed the contention as "clearly without merit." <u>Id.</u> Rather, the court framed the case as follows:

> The issue here is civil accountability for the foreseeable results of a broadcast which created an undue risk of harm to decedent. The First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act.

<u>Id.</u>

In the instant case, the issue is civil accountability for the foreseeable results of Stefani's in-person invitation to patrons to move toward the stage, which created an undue risk of harm to Plaintiff and other patrons. The <u>Weirum</u> case involved the

transmission of a contemporaneous invitation to listeners and a clear call to action. In fact, Plaintiff's case is even stronger on the foreseeability prong because Stefani's announcement was made to listeners in her immediate presence rather than through a medium such as the radio or television. Stefani could foresee what would likely occur in the Pavilion as a result of her invitation with her own eyes.

### iii. Furtherance or Hindrance of First Amendment Principles

The last step in the Court's First Amendment inquiry is to weigh how Stefani's statement and the circumstances in which it was made either further or hinder the principles and purposes undergirding the First Amendment. The Court must ask whether allowing a negligence action to go forward against Stefani (and thus "punishing" her for her speech) would curtail the exposition of ideas, the "common quest for truth," or "the vitality of society as a whole." Bose, 466 U.S. at 503–04.

Defendant argues that imposing tort liability on Stefani for her concert announcement would have a "chilling effect" on the flow of free speech. On the contrary, imposing liability on Stefani would incentivize performers to abide by the safety precautions in place at concert venues and to maintain and promote order and safety during performances. In sum, the Court finds that Stefani's statement is of the same character of speech which the Supreme Court has held to have "no essential part of any exposition of ideas" and has "such slight social value as a step to truth that any benefit that may be derived from [the statement] is clearly outweighed by the social interest in order and morality." Chaplinsky, 315 U.S. at

568.  Accordingly, Stefani's statement is not entitled to the protection of the First Amendment.  The First Amendment does not preclude Plaintiff from bringing a negligence claim against Stefani.  Finding otherwise would permit Stefani to "escape and recreate a [jurisprudence] that's [her] own world."[4]  The Court denies Stefani's Motion for Summary Judgment in regard to the negligence claim.

2.  <u>Plaintiff's Punitive Damages Claim Against Stefani</u>

In her Amended Complaint, Plaintiff alleges that Stefani's acts constitute "gross negligence, as it amounted to wantonness, willfulness, or evidenced a reckless indifference to the consequences of her acts, entitling the Plaintiff to punitive damages."  (Doc. No. 13 ¶ 33).  To be awarded punitive damages, Plaintiff must first show that she is entitled to compensatory damages, and she must prove, by clear and convincing evidence, that Stefani's conduct was "willful" or "wanton."  N.C. Gen. Stat. § 1D-15(a)-(b).  Willful or wanton is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm."  <u>Id.</u> § 1D–5(7).  "Willful or wanton conduct means more than gross negligence."  Yet Plaintiff pleads that Stefani's "negligent acts . . . constitute[ ] gross negligence."  (Doc. No. 13 ¶ 33).  By her own admission, then, Plaintiff is not entitled to punitive damages since Stefani's alleged wrongful acts amounted to gross negligence, at best, and thus her actions were not willful or wanton.

---

[4] Stefani & Akon, The Sweet Escape.

Additionally, Plaintiff failed to respond to Defendant's argument as to why her punitive damages claim should survive summary judgment. Plaintiff has abandoned her punitive damages claim. See, e.g., Chamberlain v. Securian Fin. Grp., Inc., 180 F. Supp. 3d 381, 405 (W.D.N.C. 2016) (explaining that when a plaintiff, in response to a defendant's summary judgment motion, fails to respond to arguments regarding a claim, the claim can be dismissed due to abandonment). Therefore, the Court grants Stefani's summary judgment claim in regard to the punitive damages claim.

## B. Defendant Live Nation's Motion for Summary Judgment

Plaintiff also sued Live Nation for the negligence of its security personnel under the doctrine of respondeat superior. (Doc. No. 13 ¶¶ 27–31). To survive summary judgment on this claim, Plaintiff must once again put forth evidence showing that she meets each element of negligence under North Carolina law. Shook, 563 S.E.2d at 197. That is, Plaintiff must show that Live Nation owed Plaintiff a duty of reasonable care, (2) Live Nation breached that duty, (3) Live Nation's breach was an actual and proximate cause of Plaintiff's injury, and (4) Plaintiff suffered damages as the result of Live Nation's breach. Gibson v. Ussery, 196 S.E.2d at 668.

In her Amended Complaint, Plaintiff alleges that Live Nation should be held liable for the negligence of its employees. Specifically, Plaintiff alleges that Live Nation's security personnel was negligent by failing to (1) "take actions to stop the patrons in the lawn seating area from coming to the performance stage" and (2) "to provide security barricades and other security matter and take measures to

separate the reserved seating area from the lawn seating area so as to prevent the patrons in the lawn seating area from stampede rushing through the reserved seating area toward the performance stage." (Doc. No. 13 ¶ 28).[5]  Because the Court finds that Plaintiff's claim against Live Nation fails to establish the elements of (1) duty, (2) breach, and (3) causation, the Court grants summary judgment in Live Nation's favor.

      1.  <u>Live Nation did not owe Plaintiff a duty to protect her from the crowd and her resulting injury because Stefani's actions were unforeseeable.</u>

In <u>Nelson v. Freeland</u>, the Supreme Court of North Carolina abolished the distinction between landowner's duties to invitees versus licensees and instead replaced the different standards with a singular standard: landowners owe all lawful visitors a "duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors."  <u>Nelson v. Freeland</u>, 507 S.E.2d 882, 892 (N.C. 1998).  In reaching that decision, the court noted that it was not holding that landowners "are now insurers of their premises," nor was it intending to require landowners "to undergo unwarranted burdens in maintaining their

---

[5] In her Amended Complaint, Plaintiff also alleges that Defendant Live Nation was negligent by failing to (1) "instruct Stefani to rescind her requested announcement that patrons in the lawn seating area come to the performance stage" and (2) "make a countermanding announcement throughout PNC Pavilion that patrons in the lawn seating area were not to come to the performance stage."  (Doc. No. 13 ¶ 28).  The undisputed facts show that (1) Stefani rescinded her initial invitation to the crowd with her second announcement, and (2) Live Nation instructed Stefani, through instruction to her tour manager, to rescind her invitation.  Therefore, the Court focuses on Plaintiff's other two allegations above.

premises." Id. Under North Carolina law, the extent of a landowner's duty to protect lawful visitors from the alleged wrongful acts of third parties is circumscribed by Foster v. Winston-Salem Joint Venture, 281 S.E.2d 36 (N.C. 1981). "The general duty imposed upon the owner is not to insure the safety of his customers, but to exercise ordinary care to maintain his premises in such a condition that they may be used safely by his invitees in the manner for which they were designed and intended." Id. Ordinarily, the store owner is not liable for injuries to his patrons which result from the intentional wrongdoing of third parties on his premises because "[i]t is usually held that such acts can not be reasonably foreseen by the owner, and therefore constitute an independent, intervening cause absolving the owner of liability." Id.

Foreseeability of "physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons," exists if the defendant "know[s] or has reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor." Foster, 281 S.E.2d at 38–39 (quoting Restatement (Second) of Torts § 344)). In Foster, the plaintiff was assaulted by a third party while in the defendant's parking lot. Id. at 37. At the summary judgment stage, the plaintiff had put forth evidence that the defendant had notice of at least twenty-nine previous incidents of crime in the defendant's parking lot prior to the plaintiff's assault. Id. at 40. The Supreme Court of North Carolina held that, because the plaintiff had forecasted evidence that would allow a reasonable jury to conclude that the circumstances giving rise to

the plaintiff's injuries were reasonably foreseeable to the defendant, summary judgment was improper.  Id.  Thus, foreseeability is the relevant test for determining whether Live Nation owed Plaintiff a duty to protect her from the wrongful acts of third parties—here, from the acts of Stefani and other patrons. "No legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care."  Stein v. Asheville City Bd. of Educ., 626 S.E.2d 263, 267 (N.C. 2006).

Moreover, that foreseeability must have some degree of specificity as to the type of harm alleged or the injury sustained.  In Roberts v. Mars Hill University, 802 S.E.2d 621 (N.C. App. 2017) (unpubl.), the plaintiff, a college student who lived in an on-campus dormitory, sued the college after he was assaulted by fellow students during an altercation resulting from a dispute over a prank.  Id. at *1.  The student claimed that the university had notice that the attack on him was foreseeable due to repeated criminal complaints at that particular dormitory.  Id. at *2.  Plaintiff alleged that forty-one percent of the University Police Department's ninety-five calls on campus involved the plaintiff's dormitory.  Id.  At the summary judgment stage, the court concluded that the evidence of prior hazards/dangers was overly broad in that "the ninety-five (95) calls to campus security over the course of almost six years is insufficient to raise a triable issue regarding foreseeability," provided that these calls included calls complaining of incidents distinguishable from the plaintiff's case.  Id. at *3.

Here, Plaintiff has not forecast evidence that would allow a reasonable jury to

conclude that the circumstances giving rise to Plaintiff's injury were foreseeable to Live Nation.  Plaintiff has not alleged that Live Nation had actual or constructive notice that Stefani was going to invite patrons toward the stage in advance of Stefani's announcement.  On the other hand, Defendant has proffered the testimony of multiple, longtime Live Nation employees that, in their many years of experience working at the PNC Pavilion, they had never previously seen a performer inviting patrons to approach the stage.  (Doc. No. 39 at 9–10).  Only one Live Nation employee, Charles Singley, remembered a previous performer inviting fans to move closer to the stage.  (Id.).  He noted that this incident occurred fifteen years prior to the incident at issue here.  (Id.).  This falls far short of the foreseeability threshold that the Supreme Court of North Carolina has held is sufficient to establish liability for third-party conduct.

Plaintiff argues that the relevant inquiry is not whether Stefani's announcement was foreseeable, but rather, is whether the resulting crowd rush was foreseeable.  Plaintiff, without citing any supporting sources, contends that the "phenomenon of a crowd rush in an entertainment venue is well known throughout the security entertainment industry."  (Doc. No. 60 at 9).  However, as mentioned *supra*, there must be some degree of specificity in the foreseeability analysis.  And generally foreseeing that a crowd rush might occur in a large entertainment venue is insufficiently vague and overly broad to charge Defendant with a heightened duty to insure Plaintiff's absolute safety from the acts of third persons.

Additionally, where "an unsafe condition is created by a third party [on the

defendant's property] . . . [the] plaintiff must show that it has existed for such a length of time that defendant knew or, by exercising reasonable care, should have known of its existence in time to have removed the danger or have given a warning of its presence." <u>Freeman v. Sugar Mountain Resort, Inc.</u>, 516 S.E.2d 616, 618 (N.C. App. 1999), <u>rev'd on other grounds as stated in dissent</u>, 522 S.E.2d 582 (N.C. 1999). The undisputed facts reveal that Plaintiff's injury occurred nearly five minutes after Stefani's initial invitation. The immediacy of the situation—the crowd rush prompted by Stefani's invitation—is apparent; Live Nation did not have a reasonable amount of time to remove the danger or to give warning of its presence. Live Nation learned of the danger when Plaintiff did, and its reaction to the unforeseen chaos was well within the reasonable care standard. Thus, the Court finds that Live Nation did not owe Plaintiff a duty to protect Plaintiff from the crowd rush and prevent her injury.

 2. <u>Even if Live Nation owed Plaintiff a duty, it did not breach that duty.</u>

 Although the Court finds that no duty existed and could stop the inquiry here, the Court chooses to examine the element of breach. Plaintiff claims that Defendant Live Nation breached its duty of care to Plaintiff by taking no action to prevent patrons in the lawn seating area from moving closer toward the stage and by failing to provide security barricades and other security matter and take adequate measures to prevent patrons moving from the lawn area into the reserved seating area. On the night of Stefani's concert, Live Nation personnel, (1) "positioned themselves in the aisles between, and at the tops of, the reserved

seating sections to hold the crowd back from gaining access to the lower reserved area closest to the stage" and (2) communicated with Stefani's tour manager to instruct Stefani to rescind her invitation. (Doc. No. 39 at 12). Additionally, Live Nation's security and safety measures on the night of Stefani's concert included the following:

- A five-feet-high concrete wall separating the upper reserved seating area, where Plaintiff was ticketed to sit, from the sections behind her
- A system of rails separating Plaintiff's section from those above/behind her
- Bicycle racks positioned throughout the venue, including at the tops of the reserved seating sections, where Live Nation's guest services employees were stationed
- Over thirty Live Nation ushers/guest services staff and fifty-two total civilian security personnel throughout the venue, including in the reserved seating sections
- Twenty-seven off-duty police officers deployed in and around the venue
- A pre-concert meeting/briefing held before Stefani's performance began, for the express purpose of coordinating venue security efforts
- Pre-season training of staff, including instruction on how to respond to the unlikely event of a large and sudden crowd movement toward a barricade in an effort to mitigate against mass injuries.

(Doc. No. 39 at 12). Plaintiff has not argued, nor provided expert testimony, as to why the above measures were insufficient. Rather, Plaintiff asserts that she and her friends "saw virtually no security during the rush." (Doc. No. 60 at 10). The only specific "breach" that Plaintiff alleges is that "the barrier that separates the lawn area from the aisle leading to where the Plaintiff was trampled, was removed during the crowd rush to allow the crowd to stampede through the aisle toward the stage where Plaintiff was trampled." (Id.). Here again, Plaintiff has not provided

any testimony, besides her own, as to why the movement of a barricade in the midst of a large crowd rush is a breach of the standard of care. In fact, Live Nation contends that the movement was done to aid patron safety and mitigate against injury and was consistent with Live Nation's standard protocol for responding to a crowd rush of "a massive group of people." (Doc. Nos. 39 at 13; 39-11 at 26; 59-7 at 7).

Plaintiff relies on the case of <u>Custini v. Radio City Productions, LLC</u> to argue that the question of breach of duty should be taken to the jury. 2009 WL 2459852 (N.Y. Sup. Ct. 2009). In <u>Custini</u>, during a performance at Radio City Music Hall, the show was postponed due to a musician union strike after the audience arrived and was seated. The defendant-show operator incited an angry crowd movement by making a late announcement that the show the plaintiff was attending was postponed and asking the audience to leave. A resulting crowd rush ensued in the inner lobby, and the plaintiff was trampled. The court denied the defendant's motion for summary judgment seeking dismissal of plaintiff's negligence claims against the defendant for failing to control and contain the crowd rush.

Plaintiff analogizes the present case to the facts in <u>Custini</u> to argue that summary judgment is improper on the issue of breach. Plaintiff's analogy is misplaced because the instant case is distinguishable. First, the defendant-show operator made the announcement in <u>Custini</u> and was thus the party responsible for inciting the crowd rush. Dissimilar from <u>Custini</u>, here, Stefani—a third party— made the initial announcement which triggered the crowd rush. Thus, the inquiry

in <u>Custini</u> was not whether and to what extent a venue owner/operator is liable for the alleged wrongful conduct of a third party. Moreover, in <u>Custini</u> the defendant-show operator had advance notice of the circumstances which led to the postponement announcement; here, Live Nation had no advance notice or warning of Stefani's announcement inviting the crowd to come forward. Stefani's announcement was a unilateral move which prompted patrons to move toward the stage. As such, Live Nation cannot be held responsible.

3. <u>Assuming arguendo that Defendant Live Nation had a duty and breached that duty, Plaintiff still cannot show that Live Nation caused her injury.</u>

Assuming arguendo that Plaintiff has forecasted sufficient evidence as to the elements of duty and breach, to succeed on her negligence claim against Live Nation, Plaintiff must still show that Live Nation's alleged breached actually and proximately caused her injuries. <u>Gibson</u>, 196 S.E.2d at 668. Plaintiff must show that her injury would not have occurred but for Live Nation's negligence. <u>Liller v. Quick Stop Food Mart</u>, 507 S.E.2d 602, 606 (N.C. 1998). The Supreme Court of North Carolina has previously addressed the issue of a landowner's security/safety measures and the preventability of visitor injury. In <u>Liller v. Quick Stop Food Mart</u>, a third party shot the plaintiff after an attempted mugging in the parking lot of a convenience store. <u>Id.</u> at 603. The plaintiff filed suit against the convenience store alleging that the store was negligent by not taking "adequate measures to protect its business invitees from criminal acts of third parties." <u>Id.</u> at 604. An expert witness performed a security audit of the store and testified that, given the history of criminal incidents at the store and the store's location, the security at the

store "was below the minimal standards . . . as that required by a high risk area."

Id. While the court concluded that the plaintiff had forecasted sufficient evidence as to the foreseeability of the attack, it found that proximate cause was "a different matter." Id. at 606.

The court noted that the plaintiff's assailant appeared to be intoxicated or high on drugs and looked mean, wild, and crazy. Id. The plaintiff's expert acknowledged that individuals who are irrational or intoxicated due to alcohol or drugs "are not reasonably deterred by security precautions." Id. The court reasoned that despite the plaintiff's allegations of defendant's negligence

> in failing to take adequate measures, including the provision of
> security guards and installation of a security surveillance or burglar
> alarm system, to protect its customers from the criminal acts of third
> persons, the forecast of evidence failed to show how the foregoing
> actions, or any other measures, would have prevented [the] plaintiff's
> assault.

Id. Thus, summary judgment in favor of the defendant was proper.[6] Id. The North Carolina Court of Appeals has continued to echo this rationale: "where the proposed safety measures would not have prevented the plaintiff's injury, the alleged negligent failure to take such measures could not have constituted a proximate cause of the plaintiff's injury." Davenport v. D.M. Rental Properties, Inc., 718 S.E.2d 188, 190 (N.C. Ct. App. 2011) (rejecting, at the summary judgment stage, the plaintiff's claim that defendants breached their duty to him by "failing to install

---

[6] Plaintiff argues in its Response to Live Nation's summary judgment motion that the issue of proximate cause is one for the jury to determine. (Doc. No. 60 at 11). The cases cited in this subsection all granted summary judgment in favor of defendant because the plaintiff failed to establish proximate cause.

security cameras, hire security guards, install fences, or post warning signs,"
causing him to be injured by a third party on premises controlled by the
defendants).

Here too, Plaintiff's claim should be dismissed at the summary judgment
stage because Plaintiff has failed to forecast sufficient evidence to show that, if Live
Nation had more security personnel or measures in place, her injury would have
been prevented.  Plaintiff merely asserts that Live Nation's security and guest
services personnel and other security measures/barricades were insufficient without
providing any expert testimony or other evidence to substantiate those assertions.
The only evidence she offers to support this claim is the testimony of herself and her
friends that they did not see security guards present (except for one guard) during
the alleged stampede.  Relying on this testimony, Plaintiff focuses on the purported
scantiness of security guards present, contending that Live Nation understaffed the
event with security personnel.  This parallels an argument made by the plaintiff in
Freeman v. Sugar Mountain Resort, Incorporated after he suffered personal injuries
when he was struck by another skier who jumped into him from a makeshift ski
ramp on the defendant's property.  516 S.E.2d 616, 617 (N.C. Ct. App. 1999), rev'd,
522 S.E.2d 582 (1999).  The North Carolina Court of Appeals denied summary
judgment, in part because the court disagreed with the defendant's contention that
the plaintiff's accident was not reasonably foreseeable.  Id. at 618.  In the appellate
decision, Judge Lewis disagreed with the majority and authored a dissent, asserting
that granting summary judgment in favor of the defendant was proper "for a

number of reasons." Id. at 619. One of the principal reasons, Judge Lewis argued, was that the plaintiff failed to establish proximate cause because he "fail[ed] to demonstrate how having a larger staff could have made the only accident of this nature on this night foreseeable." Id. at 621. On appeal, the Supreme Court of North Carolina reversed and remanded the appellate court's decision "[f]or the reasons stated in the dissenting opinion by Judge Lewis." Freeman, 522 S.E.2d at 582. Thus, the Supreme Court of North Carolina agreed that

> [t]o say that plaintiff's injury in a collision with another skier from outside the slope could have been prevented by having some unknown number of ski patrols employed to discover a ramp constructed off the actual ski slope, unnoticed by plaintiff and unreported by every other skier that night, is for this Court to make an improvident jump down the slope of causation.

Freeman, 516 S.E.2d at 620.

Likewise, Plaintiff fails to demonstrate how Live Nation employing more security personnel at the Pavilion would have prevented Plaintiff's injury. Besides Plaintiff pointing to evidence of her injury—the only reported injury from the concert—Plaintiff offers no evidence showing that Live Nation caused her injury. This is impermissible:

> Negligence is not presumed from the mere fact of injury. Plaintiff is required to offer legal evidence tending to establish beyond mere speculation or conjecture, every essential element of negligence, and upon failure to do so, nonsuit is proper.

Roumillat v. Simplistic Enterprises, Inc., 414 S.E.2d 339, 345 (N.C. 1992), abrogated on other grounds by Nelson v. Freeland, 507 S.E.2d 882 (N.C. 1998). Accordingly, the Court refuses to make "an improvident jump down the slope of

causation" and concludes that granting summary judgment in favor of Live Nation is appropriate. <u>Freeman</u>, 516 S.E.2d at 620.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Stefani's Motion for Summary Judgment, (Doc No. 40), is **DENIED in part** and **GRANTED in part**. Specifically, Stefani's Motion for Summary Judgment on Plaintiff's negligence claim is denied. Plaintiff's negligence claim against Stefani may proceed to trial. But, the Court grants Stefani's Motion for Summary Judgment regarding Plaintiff's punitive damages claim. Plaintiff's claim for punitive damages is **DISMISSED**.

2. Defendant Live Nation's Motion for Summary Judgment, (Doc No. 38), is **GRANTED**. Plaintiff's negligence claim against Live Nation is **DISMISSED**, and Live Nation is **DISMISSED** as a party to this suit.

3. Defendant Live Nation's Motion for Judgment on the Pleadings, (Doc. No. 25), is now **DISMISSED as moot**.

Signed: December 17, 2018

Robert J. Conrad, Jr.
United States District Judge